**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **KELVIN DUNN** | * | **CIVIL ACTION** |
| **VERSUS** | * | **NO. 16-13545** |
| **MARQUETTE TRANSPORTATION COMPANY, LLC** | * | **SECTION "L"(5)** |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.      FACTUAL AND PROCEDURAL HISTORY**

This case arises out of injuries allegedly sustained by Plaintiff Kelvin Dunn ("Plaintiff")

on or about August 21, 2015 while he was employed as a relief captain on the M/V ST. RITA,

which at the time of the accident was located in the intracoastal waterway in Bolivar, near

Galveston, Texas. Specifically, Plaintiff alleges that he slipped and fell on diesel fuel that had

accumulated in the engine room due to a fuel leak on the vessel and sustained injuries to his leg,

hip, and back.

On August 3, 2016, Plaintiff filed a complaint against Defendant Marquette

Transportation Company, LLC ("Marquette"), the owner of the ST. RITA, and Plaintiff's

employer at the time of the accident. He seeks damages under the Jones Act, 46 U.S.C. § 30104,

and general maritime law for Defendant's alleged negligence and vessel unseaworthiness.

Defendant denies liability claiming that Plaintiff's injuries were caused in whole or in part by

Plaintiff's own actions.

This matter came on for trial without a jury on July 10, 2017. The trial lasted two days.

The Court has carefully considered the testimony of all of the witnesses, the exhibits entered into

evidence during the trial, as well as the record. Pursuant to Rule 52(a) of the Federal Rules of

Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law.

To the extent that any findings of fact may be construed as conclusions of law, the Court hereby adopts them as such. To the extent that any conclusions of law constitute findings of fact, the Court adopts them as such.

## II.     FINDINGS OF FACT

(1)

Plaintiff Kelvin Dunn is an individual of the age of majority and a resident of Louisiana.

(2)

Defendant Marquette Transportation is the owner of the M/V ST. RITA, a tug boat which was maneuvering loaded chemical barges into their proper position in the fleeting area, more specifically, the Kirby Fleet area in the intracoastal waterway in Bolivar, near Galveston, Texas at the time of Plaintiff's accident.

(3)

At all relevant times, Plaintiff was employed by Defendant Marquette Transportation, as a seaman or member of the crew of the M/V ST. RITA, in the capacity of relief captain. Plaintiff's job duties required him to steer the vessel and supervise the crew, as well as walk up and down stairs, along with some other moderate physical activity.

(4)

The M/V ST. RITA has a two-level engine room, with a center stairway that leads from the upper/mezzanine level of the engine room to the lower engine room. The stairway lands on the lower engine room deck just aft of the front of the port and starboard engines, and directly between the port and starboard engine.

(5)

The engine room contains the two generators for the vessel. The M/V ST. RITA relies on one generator at a time, and automatically switches between these generators every twelve hours. The generators can also be shut off manually. In that case, the running generator would be turned off, and power would be manually switched to the other generator. The vessel is also equipped with an emergency shut off switch, which will shut off both generators, and thus all power to the vessel, simultaneously.

(6)

The switch to shut off individual generators is located on the generators themselves. The emergency shut-off switch is located outside of the engine room near the door.

(7)

When the emergency shut-off switch is activated, the vessel's engines are shut off. The vessel does have some back-up battery power, but this will only run the emergency lights and radio. Without power, the vessel can still maneuver its rudders, but the rudders are insufficient to adequately and safely steer the vessel.

(8)

The morning of the accident, the M/V ST. RITA was pushing two loaded chemical barges, at a speed of five knots. These barges had a ten foot draft, four feet wide and three hundred feet long. The M/V ST. RITA was approaching the Kirby Fleet where it would maneuver the loaded barges into the proper position in the fleeting area.

(9)

Just before 5:00 a.m., Plaintiff was awakened by the sound of the vessel's engines "backing down" as the on-duty pilot was struggling to align the chemical barges in the fleeting

area. Plaintiff left his bunk room, and went to the helm to assist Pilot Julius Brown. When he arrived at the helm, Plaintiff found the M/V ST. RITA was "sideways" trying to swing the head of the tow around to land a single barge level in the fleet. Plaintiff temporarily took over the controls and radioed for another tug in the fleet to come act as an assist boat. With an assist tug alongside and Plaintiff operating the controls, the tow was straightened back out and landed in an ordinary manner alongside the fleet.

(10)

As Plaintiff was preparing to return to his bunk room to get ready for his shift, Corey Crespo, a deckhand on the M/V ST. RITA, radioed and said, "there's some diesel or some fluid spraying from a generator in the engine room." Plaintiff left the helm and proceeded down the stairs to the mezzanine deck of the engine room to investigate the fuel leak. Upon assessing the leak, Plaintiff determined the safest response was to switch generators, rather than using the emergency cut-off switch, which would shut off power to the entire vessel. To shut off the leaking starboard generator and switch power to the port generator, Plaintiff would need to use the shut off switch located on the generator itself, which was only accessible from the floor of the engine room.

(11)

Plaintiff entered the engine room on the mezzanine level, then proceeded down the stairs to the first floor of the engine room, where the generators were located. When Plaintiff reached the bottom of the stairs, he turned to his left (towards the starboard engine) and then proceeded between the stairway and the starboard engine forward towards the running starboard generator. Corey Crespo had followed Plaintiff into the engine room and down the stairs. As soon as Plaintiff and Crespo reached the decking, they slipped on the accumulated diesel fuel. Crespo

nearly fell, but was able to catch himself on nearby equipment. Plaintiff fell and landed hard on his right hip resulting in a severely fractured femoral head.

(12)

After the fall, Plaintiff was unable to move and another deckhand came down into the engine room to assist with the transfer of generator power. When the starboard generator was shut down, the fuel leak stopped. Pilot Brown then returned the vessel to the fleet and called for an ambulance. Within the hour paramedics arrived and Plaintiff was evacuated to a hospital in Galveston, where he underwent emergency treatment and a surgery where four screws were placed in his hip to stabilize and reduce the hip fracture.

(13)

At the time of the accident, Plaintiff was wearing a pair of athletic Nike slide shoes with rubber soles. These slide shoes were not in compliance with Marquette's safety requirements for working on the deck or in the engine room. However, Corey Crespo testified that he was wearing safety work boots with rubber soles when he entered the engine room. Both Plaintiff and Crespo slipped when they attempted to enter the engine room.

(14)

While Plaintiff was not on duty at this time, he was the captain of the vessel and was well aware of Marquette's safety regulations which required employees to wear closed-toed shoes while on deck and in the engine room. However, even if Plaintiff had been wearing steel-toed shoes, he still would have slipped. Corey Crespo slipped while wear steel-toed boots. While he was able to catch his fall, he did so by grabbing on to adjacent equipment, and not because his footwear completely prevented a slip. Further, steel-toed boots are generally effective at preventing injury caused by heavy objects dropping on an employee's foot; generally, they are

5

not required because of their anti-slip properties. As Captain Nichols testified, if Plaintiff had been wearing steel-toed boots he still would have slipped; once there is diesel fuel on the bottom of your shoes, you are going to slip. While it is undeniable that closed-toe boots were required footwear for crew members working in the engine rooms, Corey Crespo, who was wearing boots, also slipped because of the diesel fuel. Captain Dunn was in violation of company safety policy and therefore negligent in not wearing the required boots; however, his negligence, in this regard, was not the cause of his fall or injury.

(15)

Further, the Court expressly finds that Plaintiff's decision to enter the lower-engine room to shut down the starboard generator and stop the fuel leak was a reasonable choice under the circumstances. The tug was approaching a barge fleeting area, pushing two loaded chemical barges. If Plaintiff had used the emergency shut-off switch outside of the engine room, he would have killed all power on the vessel. The tug had only recently regained complete control of the two barges, as the current had pushed them sideways and a second assist tug was required to get the barges back in place. Cutting off power, and the ability to navigate, would have resulted in two loaded chemical barges and a tug with a diesel leak in the engine room floating— uncontrolled—towards an entire fleet of chemical barges.

Rather than make a choice which would have exacerbated the dangerous situation already unfolding on the vessel, Plaintiff decided to enter the engine room to, as he phrased it, "fix the situation." He could not see the source of the leak from the top of the stairs, so proceeded down the stairs to the main level of the engine room when he slipped and fell on the accumulated fuel.

(16)

The Court has reviewed the evidence presented regarding the fuel leak and finds that the factual issues surrounding this aspect of the case are not significantly in dispute. Port engineer, Walter Hayes, who was responsible for coordinating and performing the maintenance aboard the ST. RITA, testified at trial. He explained that three days prior to the accident, he went aboard the M/V ST. RITA to repair one of the main engine gears. While working, he noticed that the fuel filter housing to the starboard generator appeared to be worn, so Hayes ordered a new fuel filter housing and replaced it at the same time that the main engine gear repair was underway. After installation, Hayes inspected the fitting, found it was acceptable, cleaned it, placed Teflon on its threads and reinstalled it to the new housing. Hayes then said that he restarted the generator and tested the new assembly and found that all the fittings were holding tight and not leaking diesel fuel.

(17)

Hayes also repaired the fuel pressure gage after the leak and the resulting accident. He explained that the leak began when the stem which connects the valve to the fuel filter housing broke in half. He had never known one of these stems to fail before, and had no reason to believe it would break after he completed the initial repair. Nonetheless, the broken fuel pressure gauge was the direct cause of the dangerous condition which rendered the vessel unseaworthy. Plaintiff's fall and injuries were caused directly by the unseaworthy condition of the broken fuel pressure gauge and the Defendant's negligence in failing to provide the Plaintiff with a safe place to work.

(18)

Plaintiff has undergone significant medical treatment as a result of the accident. This treatment included an emergency surgery to stabilize his broken hip, injections in the facet joints of the lower back, an epidural steroid injection, as well as physical therapy and medication. Plaintiff underwent emergency surgery under general anesthesia to place four 7.3mm stabilizing screws in the broken hip. He then attended 25 physical therapy sessions.

On August 25, 2015, he was discharged from University of Texas Medical Branch and returned to his home in Denham Springs, Louisiana. He followed up with Dr. David Pope at the Bone and Joint Clinic in Baton Rouge, Louisiana. Dr. Pope was a physician selected by Marquette to follow Mr. Dunn's recovery. Dr. Pope testified (by deposition) that he was familiar with Dr. Craig Greene as a hip and trauma specialist, and that he would defer to Dr. Greene regarding future medical treatment as it related to Mr. Dunn's hip, since Dr. Greene had taken over Dunn's care. Dr. Pope also stated that he would defer to his partner, Dr. Kevin McCarthy (a spine specialist), regarding opinions relating to Mr. Dunn's lumbar spine. Although Dr. Pope did release Mr. Dunn to return to work, Mr. Dunn's consistent complaints of lumbar spine pain while treating with Dr. Pope were never addressed. Mr. Dunn also underwent extensive physical therapy at Peak Performance Physical Therapy between September, 2015 and March, 2016 which involved electrical stimulation, flexibility exercises, isometric hip abduction exercises, and dynamic and stabilization training.

(19)

On April 4, 2016, Kelvin Dunn sought a second opinion with Dr. Craig Greene, a hip and trauma specialist at Baton Rouge Orthopedic Clinic. Dr. Greene performed an extensive evaluation on Dunn and opined Mr. Dunn will need a total hip replacement before he reaches the

age of 50, and since the hardware will not last the rest of his life, he will need a revision surgery, i.e., a second total hip replacement surgery somewhere down the road. Dr. Greene also testified that, prior to any hip replacement surgery, he would recommend hardware removal surgery, whereby Mr. Dunn would be placed under general anesthesia in a hospital setting, and Dr. Greene would remove the four large screws from plaintiff's femur. Dunn testified that he remains in significant pain in his right hip and he is ready to proceed with the hardware removal surgery. Dr. Green referred Dunn to Dr. Jeremy Comeaux, a physical medicine and rehabilitation specialist.

(20)

Dr. Jeremy Comeaux first saw Kelvin Dunn on May 5, 2016, at which time he ordered a CT scan of the lumbar spine. This CT scan was performed at Imaging Center of Louisiana on June 20, 2016, and it revealed multiple abnormalities including a herniated lumbar disc at the L4-5 level, lumbar retrolisthesis, and facet hypertrophy. Dr. Comeaux opined that all of Mr. Dunn's ongoing hip and lumbar spine complaints are indeed related to the August 21, 2015 accident in question, and that the need for ongoing care as it relates to the lumbar spine would also be related to that traumatic event. On December 2, 2016, Dr. Comeaux performed a lumbar epidural steroid injection under fluoroscopic guidance. Dunn testified that this injection helped with his pain for approximately one month. Dr. Comeaux eventually referred Mr. Dunn to orthopedic spine surgeon, Dr. Kevin McCarthy, who also practices at the Bone and Joint Clinic with Dr. David Pope.

(21)

Dr. Kevin McCarthy saw Kelvin Dunn for the first time on December 15, 2016. Dr. McCarthy's examination and treatment focused on Mr. Dunn's facet joints in his lower back. He

also felt that the retrolisthesis (shifting of the vertebrae) could definitely be a source of pain for Mr. Dunn. Dr. McCarthy gave Mr. Dunn his first round of facet injections on January 20, 2017. He injected two joints on each side of the spine with an anesthetic and a steroid medication under fluoroscope. Plaintiff did receive temporary relief from the injections, which suggested to Dr. McCarthy that his back pain was coming from the facet joints. Plaintiff underwent a second round of facet joint injections on June 20, 2017, which appear to have provided him with some relief. Dr. McCarthy testified that Mr. Dunn would benefit from additional treatment for the lumbar spine in the form of rhizotomies over the next ten-year period. Rhizotomy is a procedure that utilizes radio frequency waves to produce heat on the nerves surrounding the lumbar spine. This prevents the nerve from being able to transmit pain signals to the brain. Dr. McCarthy further testified that Kelvin Dunn will eventually need a lumbar spine fusion at some point in his lifetime as a result of the subject accident and resulting injuries. Dr. McCarthy also related all of the symptoms for which he was treating Kelvin Dunn, as well as the need for the future care (office visits, diagnostic studies, rhizotomies and ultimately a lumbar spine fusion) to the subject accident.

(22)

Plaintiff was also seen by the Defendant's independent medical expert, Dr. Christopher Cenac, Jr., in Houma, Louisiana. After examining Plaintiff, Dr. Cenac opined that Mr. Dunn would benefit from hardware removal from his hip. He also testified that he agrees with Dr. Greene in that he feels Mr. Dunn will eventually require a total hip replacement of the right hip, although he did not give a specific timeline, nor did he comment on Mr. Dunn's need for a revision hip surgery at some point in the future. Dr. Cenac further testified that the facet injections and subsequent rhizotomies being recommended by Dr. McCarthy were reasonable

and necessitated by symptoms arising from the subject accident; however, he testified that there was no indication that Plaintiff's injuries would require a lumbar fusion in the future.

(23)

Marquette's Claims Manager, Ronnie Dupuy, testified that Marquette initiated maintenance payments as of the date of incident and has continued these payments through the date of trial. Aside from the outstanding medical expenses submitted by Plaintiff at trial, the Court finds that Marquette continually and systematically paid all medical expenses and maintenance obligations up-through the date of trial.

Having considered the testimony of all the doctors, the Court finds that Plaintiff will not reach maximum medical improvement until he has had the hardware surgically removed from his hip, and has had adequate time to recover from that surgery. Thus, Defendant is responsible for paying maintenance from the date of trial up until Plaintiff recovers from the removal surgery. Based on the testimony of the doctors, the Court finds Plaintiff will reach maximum medical improvement three months from the date of the removal surgery.

(24)

Marquette shall have 60 days to review the charges which have been incurred by the Plaintiff, but not yet submitted, and to reimburse Plaintiff for same.

(25)

At the time of his injury the plaintiff was 39 years old. He attended some high school, although he did not graduate. Recent vocational testing indicates that Plaintiff has 6th grade reading comprehension and 4th grade math proficiency. Plaintiff has never obtained a GED. Kevin Dunn had an extensive maritime work history. He began working on boats at the age of 19

and started as a deckhand trainee and worked until finally promoted to captain. Dunn worked on the ST. RITA for four years.

(26)

The Court finds that Plaintiff's work life expectancy is 16.4 years and his life expectancy is 37.8 years. His post-tax wages for the year of the accident annualize to $124,500. He worked through August 21, 2015 and has not worked since that date. Based on the medical expert testimony presented by both parties, the Court finds that Plaintiff's injuries will prevent him from ever returning to his position as a captain aboard vessels. However, the evidence supports the conclusion that he is not permanently, totally disabled. After a time he will be able to return to some gainful activity requiring less physical demands.

(27)

Plaintiff's life care planner and economic expert, Stephanie Chalfin testified that if and when Mr. Dunn was able to return to work, based on his work history, his limited education, and his physical limitations as a result of the subject accident, Mr. Dunn would likely be relegated to sedentary/light duty employment earning between $8.55 to $9.00 per hour. In particular, the Court notes that Plaintiff does not have a high school diploma and tested well-below the twelfth-grade level in both reading and math. Based on this evidence, the Court finds that Plaintiff could earn $18,000 annually in a new occupation given his limited education, training, experience, and physical limitations.

Defendant's vocational rehabilitation expert, Ronnie Ducote, testified Dunn was qualified for a range of medium level jobs ranging from a scale operator to a custodial supervisor with earnings in the range of $40,000.00 - $50,000.00 per year. However, the Court finds that these salaries are unrealistic given Plaintiff's education, training, and experience. The entirety of

Plaintiff's work experience has taken place on vessels. Due to his physical limitations as a result of the accident, he is no longer able to perform this type of work. He does not have skills or experience that will transfer into most other land-based positions that are available to someone with his work restrictions. Additionally, while Mr. Ducote testified Plaintiff could earn up to $125,000 if he opened his own tattoo parlor, the Court finds this is not a reasonable future salary based on Plaintiff's training, experience, and education level.

(28)

Using Chalfin's figures on loss of earnings as applied by Plaintiff's expert forensic accountant, John Theriot, the Court finds that Plaintiff's annual salary for the purposes of computing his past and future lost wages is $124,000.00, plus fringe benefits that his employer paid such as 401K contributions and food. These figures are based on Mr. Dunn's well-documented earnings history as a boat captain.

Plaintiff has not worked since the date of the accident on August 21, 2015 through the date of trial on July 10, 2017. This represents 1.89 years, at an annualized salary of $124,000 a year. Therefore, Plaintiff is entitled to recover $234,360 in lost wages. Any wages that Defendant paid to Plaintiff after the date of his accident shall be deducted from this amount.

The Court finds that Plaintiff lost fringe benefits and the cost of meals during this period. Specifically, Plaintiff lost fringe benefits, such as 401K contributions and health care that would have been paid by his employer during this period. According to Plaintiff s economist, these benefits amount to 14.61% of his annual wages. Thus, Plaintiff is entitled to an additional $34,240 in past loss of fringe benefits. Finally, the evidence demonstrated that Plaintiff was provided meals as another benefit of his employment. Plaintiff received meals on the days he was on a hitch, which amounts to $2,392 annually. This total is based on the total number of

meals provided each year, multiplied by the average cost of a home meal as determined by the Department of Agriculture. Thus, Plaintiff shall receive an additional $4,520.88 to compensate him for lost meal benefits from his accident to the date of trial, less the maintenance payments paid to him until he reaches MMI.

Plaintiff will also sustain future losses of wages, fringe benefits, and meals. First, Plaintiff is not yet employed, and must endure additional surgeries before he is fit to return to work. Given his required future medical treatment, the Court finds it is unlikely Plaintiff will return to work within two years from the trial date. Thus, the Court will not assume any offsets to Plaintiff's future lost wages due to alternate employment during the next two years. Based on an annual wage of $124,000, Plaintiff is entitled to future lost wages in the amount of $248,000 for the next two years. Reduced to present value, this amounts to $244,329.

Additionally, during the next two years Plaintiff will suffer losses of fringe benefits and meals. As discussed above, Plaintiff received a benefit of $2,392 annually in meals. His fringe benefits amounted to 14.61% of his base salary. Together, his fringe benefits and meals are valued at $20,508.40 annually. Reduced to present value, this amounts to $40,409.75 for the two year period before Plaintiff returns to work.

Both parties agree that Plaintiff's work-life span is at least 16.4 years from the date of trial. The Court finds that after Plaintiff has the hardware removal surgery and has had adequate time to recover, he will be able to secure alternative employment with earnings of $18,000 annually. This amount will reduce his loss of wages accordingly. Therefore, for the 14.4 remaining years in Plaintiff's work life, his annual lost wages will be $106,000. Adjusted to present value, the Court finds that Plaintiff is entitled to $1,420,792.00 in lost wages for the remaining 14.4 years of his work life.

Moreover, Plaintiff will sustain losses of fringe benefits and meals during this time. Fringe benefits amount to 14.61% of his salary; however, it is reasonable to assume that any new employment would also include some of these benefits. As such, Plaintiff is entitled to compensation for 14.61% of the difference between his former salary and the salary he earns in alternate employment. Thus, Plaintiff is entitled to 14.61% of $106,000, or $15,486 annually, in lost fringe benefits. He is also entitled to $2,392 annually for lost meals. These benefits total $17,878 annually. Adjusted to present value, Plaintiff is entitled to receive $239,631.35 in fringe benefits and lost meals for the remaining 14.4 years of his work life expectancy.

(29)

Plaintiff's prior medical history indicates he was treating for anxiety and panic disorder in the few years before the accident. In relation to this treatment, Dr. Rachael Wissner prescribed Plaintiff a generic form of Ativan, which he explained he took as needed, but never while he was on the vessel. While Defendant argued this medication would have prevented him from continuing as a captain, the Court disagrees. The evidence demonstrates that Mr. Dunn was a long term and excellent employee for Marquette, and its predecessor company, Eckstein Marine. Other than a brief stint with Crosby, Dunn testified he spent his entire work life on the water with Eckstein and Marquette. While employed with Marquette, Dunn was promoted through the ranks from deckhand ultimately ending up as a relief captain. He never had any disciplinary issues while employed at the company. Dunn provided consistent service as a captain to the company between 2010 and 2015, and he never failed a single random drug test. There was no evidence of any alcohol or controlled substances in his system following the subject accident.

### III.   CONCLUSIONS OF LAW

(1)

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333, which provides

original jurisdiction over admiralty or maritime claims, and the Jones Act, 46 U.S.C. § 688.

Venue is proper because the Defendants are subject to the personal jurisdiction of this Court.

(2)

Plaintiff has designated this matter as an Admiralty and Maritime claim within the

meaning of Federal Rule of Civil Procedure 9(h), and as such, this matter is appropriately being

tried to the bench as opposed to a jury.

(3)

The testimony presented clearly establishes that Kelvin Dunn was a Jones Act seaman at

the time of the August 21, 2015 accident. Defendant did not contest Plaintiff's status as a seaman

at trial. The substantive law applied to this case is the Jones Act and general maritime law.

(4)

The matters before this Court include determination as to whether the vessel was

unseaworthy under general maritime law, whether Defendant was negligent under the Jones Act,

whether Plaintiff was contributorily negligent, and the nature and extent of Plaintiff's injuries.

(5)

"To establish a claim for unseaworthiness, the injured seaman must prove that the owner

has failed to provide a vessel, including her equipment and crew, which is reasonably fit and safe

for the purposes for which it was intended to be used." *Boudreaux v. United States of America*,

280 F.3d 461, 468 (5th Cir. 2002) (*quoting Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir.

2001)). "The standard is not perfection, but reasonable fitness; not a ship that will weather every

conceivable storm but a vessel reasonably suited for her intended service." *Boudoin v. Lykes*

*Bros. S.S. Co.*, 348 U.S. 336, 339 (1955). "A vessel's condition of unseaworthiness might arise from any number of circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The method of loading her cargo, or the manner of its stowage, might be improper." *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499-500 (1971) (internal citations omitted); *see also Webb v. Dresser Indus.*, 536 F.2d 603, 606 (5th Cir. 1976), cert. denied, 429 U.S. 1121 (1977). A vessel is unseaworthy when an unsafe method of work is used to perform vessel services. *Rogers v. Eagle Offshore Drilling Serv.*, 764 F.2d 300, 303 (5th Cir. 1985); *Burns v. Anchor-Wate Co.*, 469 F.2d 730 (5th Cir. 1972). The duty of the vessel owner to provide a seaworthy vessel is an absolute non-delegable duty.

(6)

To recover damages from an unseaworthy condition, the plaintiff is required to establish a causal connection between his injury and the breach of duty that rendered the vessel unseaworthy. *Id.*; *see also Gavagan v. United States*, 955 F.2d 1016, 1020 (5th Cir. 1992) (*quoting Johnson v. Offshore Exp., Inc.*, 845 F.2d 1347, 1354 (5th Cir.1 988)) ("To establish the requisite proximate cause in an unseaworthiness claim, a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness.").

(7)

Defendants had a non-delegable duty to provide Plaintiff with a safe place to work and provide seaworthy equipment on the vessel. The credible evidence supports the finding that Marquette breached this duty as it failed to properly maintain its vessel, the M/V ST. RITA,

specifically the fuel gauge on the starboard generator. This unseaworthy condition directly caused the fuel leak and the dangerous condition Plaintiff encountered on August 21, 2015.

The Court hereby concludes that the vessel was unseaworthy and Plaintiff's injuries and resulting damages were proximately caused by the vessel's unseaworthiness, as well as the defendant's negligence in failing to provide him with a safe place to work.

(8)

Comparative negligence may apply to decrease the amount of a plaintiff seaman's recovery on a Jones Act claim for negligence. *Jauch v. Nautical Services, Inc.*, 470 F.3d 207, 213 (5th Cir. 2006). "A seaman's contributory negligence will not bar his recovery, but may reduce the amount of damages owed proportionate to his share of fault." *Id.* "The standard of care for a seaman under the Jones Act is to act as an ordinarily prudent seaman would act in similar circumstances." *Jackson*, 245 F.3d at 528; *Gautreaux*, 107 F.3d at 338-39; *see also Norfolk Southern Ry. Co. v. Sorrell*, 127 S.Ct. 799 (2007).

(9)

Having considered the testimony of the fact witnesses and expert witnesses presented by both sides, the Court has determined that Plaintiff violated the company's safety rule regarding proper footwear in the engine room and was therefore negligent.[1] However, his negligent actions were not a cause of his fall and resulting injury.[2] The evidence clearly supports the conclusion that the cause of his fall, as well as his fellow crew member's fall, was the slippery condition of the engine room decks which rendered the vessel unseaworthy.

---

[1] Company policy requires crew members to wear steel-toed boots. However, the purpose of this policy is to prevent injury if something falls on a crew member's foot, rather than to prevent them from slipping on diesel fuel.

[2] "To establish that a seaman is contributorily negligent, an employer must prove negligence *and* causation." *Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 302 (5th Cir. 2008) (emphasis added).

(10)

Furthermore, the Court does not find that Plaintiff was contributorily negligent in his decision to enter the engine room and shut off the starboard generator. A seaman is "obligated under the Jones Act to act with ordinary prudence under the circumstances," which circumstances take account of the seaman's "experience, training, [and] education." *Martinez v. Offshore Specialty Fabricators, Inc.*, 481 Fed. App'x. 942, 947 (5th Cir. 2012) (*quoting Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 339 (5th Cir. 1997) (*en banc*)). However, "[w]here one is confronted through no fault of his own with a sudden emergency, his actions in extremis are not to be judged as they would be in ordinary circumstances." *Fruit Indus., Inc. v. Petty*, 268 F.2d 391, 394 (5th Cir. 1959). Captain Dunn was faced with an emergency. He had to choose between shutting off all power to the vessel, which was pushing two loaded chemical barges towards the fleeting area, after already been pushed off course by the current or entering the engine room to see if he could stop the leak. The Court finds that Captain Dunn's response to this emergency was reasonable under the circumstances. He chose the response which, based on his training and experience, would expose the other crew members and the vessel to the least amount of risk.

(11)

Under the Jones Act and general maritime law, an injured seaman is entitled to monetary recovery for past, present and future loss of earning capacity and wages, medical expenses, and pain and suffering resulting from an injury caused by negligence and/or unseaworthiness. *Cortes v. Baltimore Insular Line,* 287 U.S. 367, 377, 1933 AMC 9, 14 (1932).

(12)

As discussed in full above, the evidence supports the conclusion that Plaintiff has after-tax past lost earnings of $234,360.00 and future wage loss (after commuting to present value and accounting for earnings in non or light laborious work) of $1,665,121.00 (Pl. Report of John Theriot, Report of Kenneth J. Boudreaux, Ph.D.).

(13)

Defendant has paid all of Plaintiff's past medical bills which were submitted at the time of trial. Plaintiff submitted additional medical expenses on the day of trial. Therefore, Marquette shall have 60 days to review the charges which Plaintiff recently submitted, and to reimburse Plaintiff for same.

(14)

Regarding future medicals, the evidence indicates that the hardware removal surgery and post-surgery physical therapy are estimated to cost $11,992.00. Both Dr. Greene and Dr. Cenac agree that Mr. Dunn will require a total hip replacement in the future. Dr. Greene testified this surgery will take place before Mr. Dunn reaches the age of 50, and as hip replacements only last 10-12 years, he will ultimately need another hip replacement revision surgery.

Based on the report of Plaintiff's forensic accountant, John Theriot, the cost of Plaintiff's first hip replacement will be $52,444. That surgery will take place in approximately ten years; thus, once adjusted to present value, the cost of that hip surgery will be $59,434. The Court finds that the expected life of a hip replacement is ten years; Plaintiff has an estimated life expectancy of 37.8 years. Thus, he will need-at minimum--one revision hip replacement during his lifetime. According to the evidence, this procedure will cost $78,973

and take place when Plaintiff is in his late 60s. Adjusted for future value, this procedure will cost $114,947.

Next, the credible evidence indicates that Plaintiff will require a bilateral endoscopic rhizotomy every 12-18 months for the next ten years. While the Court agrees that Plaintiff will need ongoing treatment, the evidence demonstrates that the need for these procedures will decrease as Plaintiff improves following the hardware removal procedure. Thus, the Court finds that Plaintiff will only require this procedure every 24 months for the next ten years. According to Plaintiff's life care planner, each bilateral endoscopic rhizotomy will cost $33,910. This averages to an annual cost of $16,955 every year for the next ten years. Thus, the present value of this treatment is $160,585.89.

Additionally, the evidence demonstrates that Plaintiff will require follow-up orthopedic treatment, physical medicine, rehabilitation and injections for the remainder of his life. While Plaintiff estimates these treatments may need to occur up to six times per year, the Court finds that the evidence demonstrates Plaintiff's condition will substantially improve after the hardware is removed from his hip, and again after each of his hip replacement surgeries. Thus, the Court finds Plaintiff will need to attend orthopedic follow-up visits twice a year, for a discounted cost of $10,408. Likewise, Plaintiff will need to seek follow-up care in physical medicine three times per year, for a total cost of $21,886. Finally, Plaintiff will need annual lumbar injections for a total cost of $81,061. The total cost of this lifetime treatment $113,355.

Further, Plaintiff's injuries will require ongoing physical therapy and medication. Plaintiff's life care planner indicates that he will need physical therapy for ten years; the Court finds this is reasonable based on the nature and extent of his injuries. However, the Court finds that Plaintiff will likely only require 6-12 weeks of therapy every two to three years during this

period, as his condition will improve with his additional surgical procedures. The cost for this therapy is $32,415. Finally, Plaintiff will require medication, specifically Mobic and Tramadol for the duration of his life. The annual cost of these prescriptions is $641; adjusted to present value this amount is $31,426.

Regarding the lumbar spine, the weight of the evidence presented at trial shows that Dr. McCarthy, Dr. Comeaux, and Dr. Cenac all agree that Mr. Dunn would benefit from long-term pain management care in the form of facet joint injections and rhizotomies. Although one doctor disputes Mr. Dunn's need for surgery, two-level lumbar spine fusion, the weight of the evidence supports Dr. McCarthy's conclusion that the surgery is required as a result of his injuries. Mr. Dunn was an outstanding worker for 12 years and there is no indication of back problems prior to the hip injury; the lumbar spine injury occurred subsequent to the fall. Dr. McCarthy is uncertain as to the exact time Plaintiff will require this surgery, but it is likely that it will be needed in the near future. Based on the report of Plaintiff s forensic accountant, John Theriot, the cost of Plaintiff s lumbar fusion surgery will be $148,707. Due to a lack of certainty regarding the timing of this procedure, the Court will use the present cost rather than increasing it.

Plaintiff's future medicals are summarized as follows:

Hardware Removal Surgery: $11,992

Hip Replacement Surgery: $59,434

Hip Revision Surgery: $114,947

Bilateral Endoscopic Rhizotomy: $160,585.89

Orthopedist, Physical Medicine, Lumbar Injections: $113,355

Physical Therapy: $32,415

Medication: $31,426

Lumbar Fusion Surgery: $148,707

Total: $641,435.89.

Thus, the Court finds that an award of $641,435.89 for future medical expenses is appropriate.

(15)

Damages for pain and suffering may be awarded to a seaman who is injured due to the unseaworthiness of the vessel. *Sosa v. M/V Lago Izabal,* 736 F.2d 1028, 1034 (5th Cir. 1984). The Plaintiff has suffered physical pain due to his hip injury, surgery, and recovery. He will undergo additional surgeries in the near future to remove the hardware from his hip, and both Plaintiff's treating physician and Defendant's IME agree Plaintiff will eventually require a full hip replacement. He is likely to have hip and back pain in the future. The Plaintiff also faces significant restrictions in his employment due to his injuries. The Court finds that the Plaintiff is entitled to an award of $100,000.00 for past pain and suffering and $400,000.00 for future pain and suffering. An award of $500,000 for his past and future pain and suffering is appropriate given the nature and extend of Plaintiff's injuries. This award is consistent with other cases involving similar injuries.[3]

---

[3] *See Zeno v. Great At!. & Pac. Tea Co.,* 803 F.2d 178, 181-82 (5th Cir. 1986) (looking to similar cases to determine award); *Klemetsen v. H & R Block, Inc.,* 569 So. 2d 559, 559-60 (5th Cir. 1990) (awarding $111,300 for broken hip); *Fromenthal v. Delta Wells Surveyors, Inc.,* 98-1525, p. 12-14 (La. App. 4 Cir. 10/4/2000); 776 So. 2d 1, 12-14 (awarding $250,000 for hip fracture requiring surgery and residual pain and disability); *Pate v. Skate Country, Inc.,* 96-0364, p. 1 (La. App. 4 Cir. 10/9/1996); 682 So. 2d 288, 289 (awarding $200,000 for hip fracture); *Keyworth v. Southern Baptist Hospitals, Inc.,* 524 So. 2d 56, 57, 62 (La. Ct. App. 4 Cir. 1988) (awarding $225,000 for hip fracture resulting in mobility restriction); *Graham v. Offshore Specialty Fabricators, Inc.,* 09-0117, p.21 (La. App. 1 Cir. 1/8/10); 37 So.3d 1002, 1019 (awarding $225,000 for lumbar fusion with severe pain); *Bouquet v. Wal-Mart Stores, Inc.,* 06-1811 p.1-2 (La. App. 1 Cir. 12/21/07); 978 So.2d 447, 453-54 (awarding $200,000 for lumbar injections and fusion); *Matos v. Clarendon Nat. Ins. Co.,* 00-2814 (La. App. 1 Cir. 2/15/02); 808 So.2d 841 (awarding $265,000 for multilevel lumbar fusion); *Derouen v. Mallard Bay Drilling, L.L.C.,* 00-1268 p.13 (La. App. 1 Cir. 6/22/01), 808 So.2d 694, 707 (awarding $300,000 for lumbar fusion with residual disability).

(16)

A seaman injured in the course of his or her employment has a claim for maintenance and cure. Maintenance and cure is the implied right of the seaman arising from his or her employment relationship with the shipowner and is "independent of any other source of recovery for the seaman (e.g., recovery for Jones Act claims)." *Bertram v. Freeport McMoran, Inc.,* 35 F.3d 1008, 1013 (5th Cir. 1994). Thus, whether the seamen or employer was negligent is not at issue. *Brister v. AWI, Inc.,* 946 F.2d 350, 360 (5th Cir. 1991); *Jauch,* 470 F.3d at 212. Maintenance is the seaman's right to food and lodging and cure is the seaman's right to necessary and appropriate medical services, and both rights extend to the point at which the seaman reaches MMI. *See Breese v. AWI, Inc.,* 823 F.2d 100, 104 (5th Cir. 1987) (citing *Vaughan v. Atkinson,* 369 U.S. 527, 531 (1962)). Therefore, the maintenance and cure duty does not extend to treatment which is only palliative in nature and "results in no betterment in the claimant's condition." *Rashidi v. Am. President Lines,* 96 F.3d 124, 128 (5th Cir. 1996).

(17)

The evidence demonstrates that Marquette has paid maintenance and cure from the date of Plaintiff s injury until the date of trial. The credible evidence supports the conclusion that the Plaintiff sustained injuries to his hip and back on August 21, 2015 while working aboard the M/V ST. RITA and that he was unfit for duty as a result of this injury from that date until the time he is deemed to have achieved MMI. The weight of credible evidence indicates that Plaintiff has not yet reached MMI. However, Plaintiff will reach MMI three months after he has the hardware removal procedure. Thus, Defendant would ordinarily owe additional maintenance

from the date of trial to the date Plaintiff reaches MMI. However, because the Plaintiff will receive the cost of the meals which were furnished by his employer as part of his future damages, he is not entitled to any maintenance payments.

(18)

Pre-judgment interest may be awarded in admiralty cases if appropriate, and the Court finds that an order of pre-judgment interest is appropriate in this case. "Prejudgment interest is compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Jauch,* 470 F.3d at 214-15. However, pre-judgment interest on future damages is not available. *Id.* The starting date and rate of interest is left to the sound discretion of the Court. *See Doucet v. Wheless Drilling Co.,* 467 F.2d 336, 340 (5th Cir. 1972); *Marathon Pipe Line Co. v. M/V Sea Level II,* 806 F.2d 585, 593 (5th Cir.1 986), *reh'g denied,* 811 F.2d 602 (1987). The Court finds that an award of prejudgment interest is warranted on Plaintiff's past wages and past pain and suffering.

(19)

On the basis of the above Findings of Facts and Conclusions of Law, the Court finds that Plaintiff Kelvin Dunn sustained damages due to Defendant's negligence and the unseaworthiness of the vessel. Therefore, the Plaintiff is entitled to recover the following damages from the Defendants:

(1) Past wage loss: $234,360.00;[4]

---

[4] Any wage payments Defendant made to Plaintiff since the date of the accident shall be deducted from this amount.

(2) Past fringe benefits and meal loss: $38,760.88;[5]

(3) Future wage loss: $1,665,121.00;

(4) Future fringe benefits and meal loss: $280,041.10;

(5) Past medical expenses: Marquette paid all past medical bills it received before

trial. It has 60 days to review and remit payment for the medical bills Plaintiff

submitted on the date of trial.

(6) Future medical expenses: $641,435.89;

(7) Past pain and suffering: $100,000.00;

(8) Future pain and suffering: $400,000.00 and

Total: $3,359,718.87. This amount does not include deductions for past wages or other benefits

Defendant paid Plaintiff after the date of the accident, which should be deducted.

(20)

Additionally, Plaintiff is entitled to pre-judgment interest on the above-mentioned past

losses totaling at the rate of 3% percent per annum from the date of judicial demand until

satisfied. Furthermore, the Plaintiff is entitled to post-judgment interest at the federal judicial rate

from the date of judgment until paid.


New Orleans, Louisiana, this 6th day of September, 2017

_____

UNITED STATES DISTRICT JUDGE

---

[5] Any payments Defendant made to Plaintiff for fringe benefits, such as health insurance, 401K contributions, or meal payments since the date of the accident shall be deducted from this amount.